# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### COOKEVILLE DIVISION

| | | |
|---|---|---|
| RENITA DARLING, Individually, and as<br>Surviving Spouse and Next of Kin of<br>Philip James Darling, Deceased, | ) <br> ) <br> ) <br> ) | |
| Plaintiff, | ) <br> ) | |
| vs. | ) <br> ) | NO. 2:05-CV-00017<br>JUDGE HAYNES |
| J.B. EXPEDITED SERVICES, INC.,<br>C&M TRANSPORT CORP., a/k/a<br>C&M TRANSPORT, INC., and<br>KAZIMIERZ A. KUSNIERZ, | ) <br> ) <br> ) <br> ) <br> ) | |
| Defendants. | ) | |

## M E M O R A N D U M

Plaintiff, Renita Darling, a Tennessee citizen, as surviving spouse of Philip James Darling, the decedent, originally filed this wrongful death action in the Circuit Court for Putnam County, Tennessee against the Defendants: J.B. Expedited Services, Inc. ("JBE"), an Illinois corporation; C & M Transport Corp., a/k/a C&M Transport, Inc. ("C & M"), an Ohio corporation; and Kazimierz A. Kusnierz, an Illinois citizen at the time of the events at issue. Plaintiff's claim arises out of an accident on February 12, 2004, in which a box truck operated by Kusnierz struck and killed Darling, her husband. Plaintiff asserts claims for negligence, negligence *per se*, negligent failure to maintain adequate safety management controls and safety fitness standards, gross negligence, negligent entrustment, negligent selection, hiring, supervision and retention. Plaintiff contends that the Defendants are jointly and severally liable for Darling's wrongful death.

1

The Defendants removed this action to this Court under 28 U.S.C. § 1441 and 28 U.S.C. § 1446, citing 28 U.S.C. § 1332, the federal diversity statute. Plaintiff did not object to removal and the parties proceeded with discovery.

Before the Court are the following motions: Defendant JBE's motion for summary judgment, (Docket Entry No. 37); Defendant Kusnierz's motion for summary judgment (Docket Entry No. 34); C & M's motion for summary judgment (Docket Entry No. 38); Defendants' motion for hearing (Docket Entry No. 40); Defendant Kusnierz's motion to strike affidavits (Docket Entry No. 51); JBE's second motion for summary judgment (Docket Entry No. 55); Plaintiff's motion for sanction including denial of summary judgment (Docket Entry No. 57); and Plaintiff's motion for Order of reference for ADR proceedings (Docket Entry No. 68).

The Court first addresses the three motions on evidentiary issues: C & M objections to the admissibility of the Plaintiff's expert testimony; (Docket Entry No. 43-1). Kusnierz's motion to strike the affidavits of Plaintiff's experts;(Docket Entry No. 51); and Plaintiff's motion on C & M's spoliation of evidence. (Docket Entry No. 57). The Court addresses these motions first because resolution of those motions may impact the Defendants' motions for summary judgment. The defense motions seek exclusion of Plaintiff's expert testimony for submission in violation of the Case Management Order and for noncompliance with Daubert.

### A. Evidentiary Motions

### 1. Defendants' Motion to Strike Testimony

The Defendant Kusnierz's motion to strike involves the affidavits of Plaintiff's experts and relies upon the Case Management Order (Docket Entry No. 25), that required

2

Plaintiff's expert opinion disclosures by January 23, 2006 deadline. Plaintiff's counsel requested and one of the Defendants' counsel indicated his willingness to agree to extend this deadline to February 23, 2006 with conditions. (Docket Entry No. 43-1, C & M Objection, at 1-2; Docket Entry No. 52, Kusnierz Motion to Strike Affidavits, at 1). (Docket Entry No. 67, Plaintiff's Response to Motion to Strike, at 9). C & M counsel advised Plaintiff's counsel that such an extension would probably be given, if he provided "a definite day in the near future" when the Plaintiff's expert disclosure would be made. (Docket Entry No. 59-1, Exhibit F, March 28, 2006 Letter from Rader to Kress). Plaintiff, however, did not provide a definitive date. (Docket Entry No. 43-1, C & M Objection to Plaintiff's Expert Affidavits, at 1-2).

In her response to Defendant Kusnierz's motion for summary judgment, Plaintiff's counsel attached the four experts' affidavits. (See Docket Entry No. 39). Defendants insist that Plaintiff's response was their first awareness that the Plaintiff intended to retain any expert witnesses. (See Docket Entry No. 52, at 1).

Plaintiff responds that any delay was harmless and unintentional, and that her experts' affidavits were provided 150 days before the trial date. (Docket Entry No. 67, Plaintiff's Response at 9). Plaintiff's counsel also states that he telephoned C & M's counsel on March 29, 2006 "to advise that the [expert] disclosures would be submitted the next day, and the disclosures could be hand delivered on March 30, 2006." (Docket Entry No. 67, Plaintiff's Response to Motion to Strike, at 8).

On March 29, C & M's counsel objected to Plaintiff's counsel's offer to hand deliver the affidavits the next day, responding "that it would not be necessary to immediately hand-deliver the disclosures, stating that it would be okay to wait until

Monday, April 3, 2006, to [send] them." (Docket Entry No. 67, Plaintiff's Response to Motion to Strike, at 8). Plaintiff's counsel delivered her expert disclosures on April 3rd, and attached a letter that reflected his understanding that the delivery was in accord with the parties' earlier agreement as well as C & M's counsel request to submit a revised case management order. (Id. at 8-9).

Plaintiff asserts that despite numerous requests for compliance, Defendants were several months late in filing their written discovery responses and refused to participate in a settlement conference, as required by the Case Management Order. Plaintiff's counsel agreed to the Defendants' requests for extensions to respond to the Plaintiff's discovery requests, and the date for the Defendants' disclosure of expert reports. (Docket Entry No. 59-1, Plaintiff's Motion for Modification of Case Management Order No. 1, Exhibit G, Letter from Kress to Rader April 3, 2006; Docket Entry No. 67, Plaintiff's Response to Motion to Strike, at 9).

Defendants move to strike this expert testimony on several grounds: (1) these reports are too late and prejudice the Defendants by requiring a motion upon <u>Daubert v. Merrell Dow Pharms., Inc.,</u> 509 U.S. 579 (1993); (2) due to the Plaintiff's failure to disclose experts, the Defendants do not have experts because defense counsel assumed that the Plaintiff would not retain an expert; and (3) the experts' affidavits are inadmissible under <u>Daubert</u> and Fed. R. Evid. 702. (See Docket Entry Nos. 43-1, C & M Objection; Docket Entry No. 52, Kusnierz Motion to Strike).

The pertinent sanction rule of the Federal Rules of Civil Procedure provides as follows:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to

4

discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions.

Fed. R. Civ. P. 37(c)(1).

"The exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless." Dickenson v. Cardiac & Thoracic Surgery of Eastern Tenn., 388 F.3d 976, 983 (6th Cir. 2004) (quoting Musser v. Gentiva Health Servs., 356 F.3d 751, 756 (7th Cir. 2004)).The Sixth Circuit cautions that "exclusion necessarily entails dismissal of the case, the sanction must be one that a reasonable jurist, appraised of all the circumstances, would have chosen as proportionate to the infraction." Dickerson, 388 F.2d at 983 (quoting Musser, 356 F.3d at 758). "[T]he harshness of a sanction that deprives an innocent party of their day in court," and "an innocent plaintiff should not be penalized for the conduct of an inept attorney." Freeland v. Amigo, 103 F.3d 1271, 1277-78 (6th Cir. 1997).

The Fifth Circuit lists four factors to consider on exclusion of non-disclosed expert testimony: "(1) the importance of the excluded testimony, (2) the explanation of the party for its failure to comply with the court's order, (3) the potential prejudice that would arise from allowing the testimony, and (4) the availability of a continuance to cure such prejudice." E.E.O.C. v. General Dynamics Corp., 999 F.2d 113, 115 (5th Cir. 1993).

As to the first factor, Plaintiff's expert testimony is critical to her claim because with its exclusion, the Defendants would be entitled to summary judgment on their contention that Darling fell into the path of Kusnierz's truck. Without her experts,

5

Plaintiff lacks any other witness to prove that her husband was actually pulled under the rear wheels of Kusnierz's truck. Accordingly, the Plaintiff would be unable to prove whether Kusnierz's acts or omissions or of his co-defendants, were a proximate cause of her husband's death.

On the second factor, from the Court's review, all counsel disregarded the case management order by agreeing among counsel to reset deadlines without Court approval. The Court does not discourage agreements among counsel, but such agreements should be reflected in the Agreed Orders that avoid the type of controversy here. There is some evidence that Plaintiff's counsel relied upon C & M's counsel's statement that the Defendants would accept expert affidavits after the modified date, provided that Plaintiff's counsel would provide definitive dates for future disclosure. Upon disclosure of her experts' statements, Plaintiff's counsel expressed his willingness to extend the time for Defendants' expert witnesses' disclosure.

As to any prejudice to the Defendants, the Defendants knew of the Plaintiff's counsel's intention to retain expert witnesses when Plaintiff's counsel requested an extension for expert disclosures in January, 2006. The nature of this case makes the necessity of an expert obvious. Plaintiff's experts' affidavits were filed almost five months before the scheduled trial date. Fed. R. Civ. P. 26(a)(2)(c) sets a deadline of 90 days prior to the trial date. The Court has since granted the Defendants time to secure experts. The Defendants have been able to articulate a <u>Daubert</u> challenge.

The Court concludes that all counsel share in the responsibility for non-compliance with the Case Management Order. The exclusion of Plaintiff's expert testimony would result in dismissal of the her claim. The late disclosure does not

6

prejudice the Defendants. Thus, Defendants' motion to strike the Plaintiff's experts' affidavits should be denied.

## 2. C & M's <u>Daubert</u> Objections

As reflected in her response to the Defendants motion for summary judgment, Plaintiff retained several experts whom the Defendants contend present opinion testimony inadmissable under <u>Daubert</u>. The Court reviews each expert's qualifications and opinions.

### a. David A. Stopper

Plaintiff retained David Stopper, a private forensic consultant, as an expert in accident reconstruction and transportation safety. According to his *curriculum vitae*, Stopper was in law enforcement in Fairfax County, Virginia, for 17 years with the final "two years on the police academy staff in charge of all traffic, motor carrier safety, and accident investigation training." (Docket Entry No. 39-6, Stopper Affidavit, *curriculum vitae* at 1). From 1989-2001, Stopper was an instructor at the Texas Engineering Extension Service of Texas A & M University, where he taught courses on accident reconstruction and investigation "to law enforcement officials, engineers, as well as investigators from local, state, federal, national, and international agencies." (<u>Id</u>., at 1-2). Stopper holds a commercial driver's license (CDL) for all classes of commercial motor vehicles, <u>id</u>. at 1, and has given numerous lectures and presentations concerning accident reconstruction throughout the country. (<u>Id</u>. at 8-12). In the last four years, Stopper was deposed or testified in about one hundred (100) cases.

Stopper's opinion testimony is that Darling did not fall into the path of traffic. Given the distance between the box truck axles, the speed at which the box truck was

7

traveling, the site of the collision, and the positioning of Darling's remains, Stopper opines that, "Mr. Darling could not have fallen from the shoulder of the roadway . . . so as to become situated between the [box truck]'s front and rear axles"—he "must have been sideswiped and projected to that point in the travel lane [where his body was found] while being run over." (Docket Entry No. 39-6, Affidavit of David A. Stopper, Preliminary Report at p.12).

Stopper also duplicated Kusnierz's trip from Mesquite, Texas to Nashville, concluding that "he could not have traveled to the collision site within the allowable hours of service as well as taken the rest breaks he claimed on his driver's daily logs. The distance was found to be 718 miles from the time he loaded in Mesquite, TX. His driving time from Dallas, Texas was in excess of the allowable 11 driving hours." (Id. at p. 13). Stopper relates his knowledge of the skills required of commercial driver licensees, fatigue and hours of service regulations, and the obligations of employers to monitor the drivers in their employ.

Stopper's conclusions are based upon police reports, the record in this case, discovery disclosures and depositions from the parties, an inspection of the accident scene, duplication of Kusnierz's travel route, United States Department Of Transportation reports and regulations, and National Transportation Safety Board ("NTSB") publications, among other sources. (Id. at pp.1-4).

### b. Paul Dillard

Paul Dillard, a safety consultant to the transportation industry, studied whether "unsafe practices played a role in the accident and to determine if anyone acted in an unsafe manner." (Docket Entry No. 39-7, Dillard Affidavit, Expert Witness Report at 1).

Dillard has an undergraduate degree in business administration, with a concentration in transportation and physical distribution with 18 years experience in "motor carrier safety and compliance," Id. Since 1999, Dillard has given expert testimony in over forty cases. (Id., Testimony). Dillard's opinion testimony is based upon police reports, the record in this case, and Mr. Stopper's report, among other sources. (Id. at 1-2).

Dillard opines that C & M failed to train Kusnierz properly citing the absence of "documented evidence that C & M provided the necessary supervision, training or guidance to Kusnierz to address accident prevention, specifically this type of situation involving a disabled vehicle with potential pedestrian activity," specifically a lack of training concerning hours-of-service and driver fatigue. Dillard cited the testimony of C & M management official who admitted that "driver safety meetings are not required but occur impromptu and voluntarily." (Id.). Dillard notes the absence of documentary evidence that C & M audited Kusnierz's driver logs for accuracy. Thus, Dillard opines that C & M failed to meet appropriate standards of driver supervision. (Id. at 4).

Given his experience organizing and implementing safety programs for carriers, Dillard opines that "[t]he safety program of C & M can be described as 'window dressing' and lack[s] safety management controls to effectively monitor the safe operation of their vehicles. Reasonably prudent safety personnel of a motor carrier placed in the same position would have foreseen the possibility of harm resulting from their acts or omissions to act." (Id. at 3).

### c. Merrill Mitler

Plaintiff also retained Merrill M. Mitler, Ph.D. an expert in sleep physiology. Dr. Mitler's doctoral degree is in developmental and physiological psychology from

Michigan State University. Dr. Mitler was a postdoctoral fellow at Stanford University and has held numerous academic and professional appointments. Dr. Mitler published more than 200 articles in scientific books or journals, in addition to professional presentations. (Docket Entry No. 39-8, Affidavit of Merrill M. Mitler, Ph.D., *curriculum vitae*). In the past twenty-three years, Dr. Mitler has testified in ten cases. (<u>Id</u>., <u>Expert Report</u> at 6). The Department of Transportation retained Dr. Mitler's services as a consultant "on matters related to fatigue and hours of service for commercial truck drivers," and Dr. Mitler oversaw DOT's 1996 study of driver fatigue, "to date, the world's largest objective study of fatigue in commercial truck drivers." (<u>Id</u>. at 1). Dr. Mitler is currently Program Director at The National Institute of Neurological Disorders and Stroke within The National Institutes of Health. (<u>Id</u>.).

Dr. Mitler opined that (1) "Kusnierz was fatigued and sleep deprived at the time of the crash"; (2) Kusnierz's attention and driving abilities were altered by this fatigue; (3) his fatigue was a contributing factor to the accident that killed Mr. Darling; and (4) Kusnierz's employers bear responsibility for this crash by not properly training him regarding fatigue management or the effects of fatigue on driving ability, as well as failure to properly document and monitor his hours of service. (<u>Id</u>. at 3-4). Specifically, Dr. Mitler concluded that the accident in question "is consistent with the presence of inattentiveness and driver fatigue on the part of Mr. Kusnierz." (<u>Id</u>. at 3).

Dr. Mitler based his conclusions upon police reports, the record in this case, Stopper's report, previous published studies on sleep and fatigue, including articles that he authored or co-authored, among other sources. (<u>Id</u>. at 2, 4-6).

### d. Dennis Wylie

10

Plaintiff retained Dennis Wylie, another expert on the effects of fatigue upon commercial truck drivers. Wylie has an undergraduate degree in physics, with published studies on fatigue for the Federal Motor Carrier Safety Administration and the Federal Highway Administration. Wylie's publications include The New England Journal of Medicine. (Docket Entry No. 39-9, Affidavit of Dennis Wylie, curriculum vitae at 1, 3-4). Wylie is co-author of the Model Driver's Manual for Commercial Vehicle Driver Licensing. (Id. at 4). Over the past four years, Wylie has testified or been deposed as an expert for twenty-three trials. Id.

Wylie concluded that Kusnierz could have prevented the accident if he abided by the customary standard of care established by the Commercial Driver License Manual. (Id., Expert Report at 5-6). Wylie constructed a mathematical model to demonstrate that Kusnierz could have brought his truck to a stop after seeing Darling's disabled van. (Id., Figure 1). Wylie concluded that "because [Mr. Kusnierz] drove more than 11 hours, . . . he was required, but did not take, 10 consecutive hours off duty. If he had done so, this accident surely would not have happened." (Id. at 10). He also offered observations concerning the general effects of fatigue on driver safety. (Id. at 7-9).

Wylie also opined that "Kusnierz failed to use reasonable, customary standard of care in operating his commercial motor vehicle, especially with respect to maintaining a proper lookout, sounding his horn, controlling his speed, managing space, seeing hazards, and having a plan to avoid striking a pedestrian in the vicinity of the disabled van." Id. at 11. Wyle also opined that Kusnierz was likely fatigued, that this fatigue was a contributing factor to the accident, and that his employer(s) should have known that his driving schedule was in violation of the hours-of-service requirements of the Federal

Motor Carrier Safety Regulations. Id. at 11-12. Wylie based his opinions on police reports, the record in this case, and the other experts' reports, among other cited sources. Id., List of Materials Reviewed.

### e. Conclusions of Law

All evidence submitted on a motion for summary judgment must be admissible under the Federal Rules of Evidence. Fed. R. Civ. P. 56(e)(2006). The pertinent Federal Rules of Evidence on the admission of expert testimony are:

> Rule 702. Testimony by Experts
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

> Rule 703. Bases of Opinion Testimony by Experts
> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

> Rule 403. Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time
> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

> Fed. R. Evid. 403, 702, 403.

"To qualify as an expert under Rule 702, a witness must first establish his expertise by reference to 'knowledge, skill, experience, training, or education.'" Pride, 218 F.3d 566, 577 (6th Cir. 2000). The qualification standard is applied liberally. U.S. v. Barker, 553 F.2d 1013, 1024 (6th Cir. 1977). "The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." Berry v. City of Detroit, 25 F.3d 1342, 1351 (6th Cir. 1994).

In Daubert, the Supremem Court imposed a "judicial gatekeeping" role upon the district courts for expert opinion testimony based on scientific knowledge. Daubert requires that "[i]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method, i.e., 'a grounding in the methods and procedures of science [that] connote more than subjective belief or unsupported speculation' and that 'apply to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.'" 509 U.S. at 590 (quoting Webster's Third New Int'l Dictionary 1252 (1986)). "In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." Id. In a footnote, the Court emphasized that "evidentiary reliability [means] trustworthiness." Id. at 590 n.9. Later, the Court emphasized that "[t]he focus of course, must be solely upon principles and methodology, not only the conclusions that they generate." Id. at 595, 113 S.Ct. at 2797.

In Daubert, the Court listed the following (non-exhaustive) factors for consideration of whether the opinion testimony involves scientific knowledge:

[W]hether [the theory or technique] can be (and has been) tested [;]

13

[W]hether the theory or technique has been subjected to peer review and publication [;]

[I]n the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error [; and]

Widespread acceptance can be an important factor in ruling particular evidence admissible, and 'a known technique which has been able to attract only minimal support within the community may properly be viewed with skepticism.'

Id. at 593-94 (citations omitted).

While a person may be qualified as an expert, his testimony may still be inadmissible if the methodology "employed by the expert in analyzing the data obtained in the visual inspection, and the scientific basis, if any, for such an analysis" is unreliable. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 153 (1999). Further, "[p]roposed [expert] testimony must be supported by appropriate validation." Daubert, 509 U.S. at 590.

[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in Daubert where they are reasonable measures of the reliability of expert testimony.

Kumho Tire Co., 526 U.S. at 152. This broad discretion is consistent with the gatekeeping role of the district judge that Daubert envisioned.

Yet, a district court is not required to conduct an evidentiary hearing to qualify an expert witness under Daubert, Clay v. Ford Motor Co., 215 F.3d 663, 667 (6th Cir. 2000), but must state its reasons for denying the expert from testifying. Busch v. Dyno Nobel, Inc., 40 Fed. Appx. 947, 960-61 (6th Cir. 2002).

Daubert requires more than a review of an expert's resume. See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) ("[N]othing . . . requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the

14

expert."). "Indeed, this Court's reliability determination must be based on a deeper analysis of a witness's use of particular methodology, in order to determine whether the witness's testimony is sufficiently reliable to allow the trier of fact to deem their testimony 'expert' in this case." Coffey v. Dowley Mfg., Inc., 187 F.Supp.2d 958, 975 (M.D. Tenn. 2002). Accordingly, the Court must consider the actual principles and methods used by the expert's in crafting their affidavits. In the Sixth Circuit, "[t]he failure of [a party's] experts to test their hypotheses in a timely and reliable manner or to validate their hypotheses by reference to generally accepted scientific principles as applied to the facts of [the] case renders their testimony . . . unreliable and therefore inadmissible . . . ." Pride, 218 F.3d at 578.

"[S]cientific testimony must 'fit' the facts of the case, that is, there must be a connection between the scientific research or test result being offered and the disputed factual issues in the case in which the expert will testify." Pride, 218 F.3d at 578. Of course, the Court rules only with regard to admissibility, not the veracity of an expert's conclusions, which is left to "[v]igorous cross-examination, presentation of contrary evidence, and careful [jury] instruction on the burden of proof." Daubert, 509 U.S. at 596, 113 S.Ct. at 2798. See also, Jahn v. Equine Services, PSC, 233 F.3d 382, 391 (6th Cir. 2000) (holding that a district court is to decide on the admissibility of expert testimony, not its credibility).

For their objections, the Defendants argue inadmissibility and the likely need of a hearing for an "extensive Daubert challenge, which will ensue if [the experts'] affidavits are allowed to stand." (Docket Entry No. 70, Kusnierz Reply to Response to Motion to Strike Affidavits, at p.2). The Defendants argue the affidavits should be excluded

because they are not based upon personal knowledge. (See Docket Entry No. 43-1, C & M Objection to Plaintiff's Expert Affidavits, at 2-7).

First, the Court concludes that the experts retained by the Plaintiff satisfy the qualification requirements for establishing expertise—"knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Several specific points are worth mentioning. The Plaintiff's experts have testified as experts in legal actions over the past four years.

Second, the Plaintiff's experts performed calculations for their mathematical analyses of the collision, specifically on Kusnierz's ability to bring his truck to a complete stop after seeing Darling's disabled van. (Docket Entry No. 39-6, Affidavit of David A. Stopper, Expert Report at 10-12; Docket Entry No. 39-9, Affidavit of Dennis Wylie, Expert Report at 5-7). Their analyses were based on sufficient information, both from the record and the accident report. The Plaintiff's experts' other opinions relied upon their knowledge of and familiarity with professional practices, custom, and common safety practices; and scientific and academic experiences studying the effects of fatigue on commercial truck drivers.

"[U]nlike key witnesses, who must testify based on personal knowledge, expert witnesses do not need to have personal knowledge of the underlying facts; they may testify to opinions based on facts perceived by or made known to the expert before the hearing." Jack B. Weinstein et. al., Weinstein's Fed. Evid. § 712.02[2] (2d ed. Lexis 2006). As the Supreme Court noted in Daubert,

> [u]nlike an ordinary witness, * * * an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. * * * Presumably, this relaxation of the usual requirements of firsthand knowledge * * * is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.

16

509 U.S. at 592.

The Court concludes that at this stage, Plaintiff's experts satisfy the requirements for expert testimony set forth in Fed. R. Evid. 702, 703, and 403, as well as <u>Daubert</u> and <u>Kumho Tire Co.</u>

### 3. Plaintiff's Motion in Limine and for Sanctions

Plaintiff's motion in limine seeks a jury instruction for the Defendants' destruction of relevant documents that Plaintiff's counsel requested prior to filing this action. The Plaintiff seeks the sanction of denial of the Defendant's motions for summary judgment and a jury instruction that "a[n] adverse inference/negative presumption [applies] to the requested driver's logs . . . , the log auditing reports related to Kazimierz A. Kusnierz's drivers [sic] logs, and the lease in effect between C & M and J.B. . . . ." (Docket Entry No. 57-1, Motion <u>In Limine</u> and for Sanctions, at 2, 24-25).

In their response, Kusnierz and JBE contend that dismissing their motions for summary judgment would be an inappropriate sanction for Defendant C & M's alleged spoliation of evidence. (Docket Entry No.62, Kusnierz Response to Motion for Sanctions, at 1; Docket Entry No. 65, JBE Response to Motion for Sanctions, at 1-2).

As to the context for this motion, on March 4, 2004, two weeks after the deadly accident, Plaintiff's counsel sent a letter to C & M requesting that "certain physical items and routine records should be retained in anticipation of possible litigation." (Docket Entry No. 57-1, Motion <u>In Limine</u> and for Sanctions, at 2). Among these items, Plaintiff requested information that motor carriers are required to retain under 49 C.F.R. § 395.8, including Kusnierz's records of duty status. (<u>Id</u>. at 3-4). Plaintiff's counsel also requested that C & M retain the lease agreement between itself and Defendant JBE for

the box truck that was involved in the accident. (Id. at 6). When C & M did not reply, Plaintiff's counsel sent another letter, dated April 19, 2004, reaffirming his request. Mark Steverding, C & M's Safety Director testified that he received these letters and forwarded them to the company's counsel. (Id. at 3-6).

C & M produced Kusnierz's logs from February 3-13, 2004, (Docket Entry No. 61, C & M Reply to Motion for Sanctions, at 3), but Kusnierz's logs and the attendant documents beginning six months prior to March 4, 2004, were destroyed as well as the lease agreement between C & M and JBE (Docket Entry No. 57-1, Motion In Limine and for Sanctions, at 5-6). C & M denies any obligation to retain Kusnierz's logs for the period beginning six months before Mr. Kress' letter because such documents have no bearing on the claims before the Court. (Docket Entry No. 61, C & M Reply at 4).

For spoliation issues in this diversity action, state law applies and the Court applies Tennessee law. See Beck v. Haik, 377 F.3d 624, 641 (6th Cir. 2004). Tennessee law creates a negative inference as the appropriate sanction "against a party who has intentionally, and for an improper purpose, destroyed, mutilated, lost, altered, or concealed evidence." McLean v. Bourget's Bike Works, Inc., No. M2003-01944-COA-R3-CV, 2005 WL 2493479, at *4 (Tenn. Ct. App. Oct. 7, 2005) (citing Bronson v. Umphries, 138 S.W.3d 844, 854 (Tenn. Ct. App. 2003); Leatherwood v. Wadley, 121 S.W.3d 682, 703 (Tenn. Ct. App. 2003).[1] Yet, the Western District of Tennessee interpreted Tennessee law as not requiring intentional and bad faith in every instance.

_____

[1]The Sixth Circuit has considered questions of spoliation in terms of "a 'continuum of fault,' from innocence through the varying degrees of negligence to intentional destruction." Tucker v. General Motors Corp., No. 91-3019, 1991 WL 193458, at *2 (6th Cir. Sept. 30, 1991) (quoting Welsh v. United States, 844 F.2d 1239, 1245-47 (6th Cir. 1988)).

In Tennessee, '[t]rial courts have wide discretion to determine the appropriate sanction to be imposed.' Mercer v. Vanderbilt University, Inc., 134 S.W.3d 121, 133 (Tenn. 2004). The Tennessee Court of Appeals has stated that an intentional act is a prerequisite for imposing a negative inference against a party. * * * However, 'trial judges have the authority to take such action as is necessary to prevent discovery abuse.' * * * Moreover, "[t]rial judges should have the leeway to tailor sanctions to ensure that spoliators do not benefit from their wrongdoing -- a remedial purpose that is best adjusted according to the facts and evidentiary posture of each case." * * * Thus, because the Tennessee Supreme Court stresses that the trial court should have wide discretion to impose the appropriate sanction, the Court concludes that bad faith and an intentional and wrongful act are not prerequisites for imposing an adverse inference sanction.

Clark Constr. Group, Inc. v. City of Memphis, 229 F.R.D. 131, 139-40 (W.D. Tenn. 2005).

Generally "[s]poliation is defined as the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for the destruction." United States v. Copeland, 321 F.3d 582, 597 (6th Cir. 2003) (citing Black's Law Dictionary 1401 (6th ed. 1990)). An adverse inference sanction is always rebuttable—the effect of the sanction is to shift the burden to the spoliator to disprove the negative inference. See Welsh v. United States, 844 F.2d 1239, 1248 (6th Cir. 1988).

C & M asserts the lack of any impropriety, as "the law only requires that logs be retained for six months." (Docket Entry No. 61, C & M's Response to Motion for Sanctions, at 4). Under federal regulations, motor carriers are required to retain such "records of duty status and all supporting documents for each driver it employs for a period of six months from the date of receipt." 49 C.F.R. § 395.8(k)(1) (2006).

As of the date of Plaintiff's counsel's letter, this regulation required C & M to maintain these records for the prior six months. Counsel's letter about a deadly accident involving a C & M driver would reasonably be expected to command C & M's attention.

Plaintiff's counsel's letter commanded sufficient attention to be referred to C&M's company counsel. Plaintiff's counsel's request for those documents is clearly relevant. Tennessee law has deemed failure to comply with federal safety rules as negligence, as discussed infra. The six months record of Kusnierz's log books and accompanying documents may establish any misconduct by Kusnierz, as well as C & M's awareness of such misconduct. The log book and accompanying documents could also have been relevant to establish direct misconduct by C & M. These documents could be relevant to Plaintiff's claims for punitive damages.[2] The lease agreement between C & M and JBE clearly could clarify the employment relationship between Kusnierz and his co-defendants. This issue is raised in JBE's motion for summary judgment.

Given Plaintiff's counsel letter to C & M, the subject of that letter involving a death and a C & M employee and a federal law requiring maintenance of these records, the totality of the circumstance here gives rise to an inference that the documents were intentionally destroyed.

Under these circumstances, the Plaintiff is be entitled to a rebuttable, adverse inference jury instruction on her claims of negligence against Defendant C & M. The Court concludes that the jury should be instructed that C & M bears the burden of disproving the negative inferences drawn from the fact of missing evidence of Kusnierz's log book and attendant documents. Specifically, the jury will be instructed to infer: (1) that C & M failed to monitor properly Kusnierz's safety performance; (2) that C & M was aware of safety violations, including hours-of-service violations; and (3) that C & M

---

[2] Under Tennessee law, "a court may . . . award punitive damages only if it finds a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly. * * * A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances." Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 (Tenn. 1992).

knew Kusnierz was operating on a time schedule known to produce fatigue and failed to monitor this situation.

This instruction will be limited to C & M because there is not any evidence that Kusnierz and JBE were responsible for this spoliation.

### C. Defendants' Motions for Summary Judgment

In their motions for summary judgment, Kusnierz, C & M and JBE contend: (1) that Kusnierz did not breach any duty owed to the decedent; (2) that Kusnierz's acts or omissions were not a proximate cause of the accident; and (3) that the decedent was entirely responsible for the accident or has fifty percent (50%) or greater responsibility for the accident, relieving all Defendants of any liability under Tennessee law. As to other contentions, Defendant JBE argues: (1) that as a matter of law, Kusnierz was not its agent or employee so as to preclude JBE's liability on Plaintiff's negligence claims against JBE.

### I. REVIEW OF THE RECORD[3]

At approximately 7:50 a.m., February 12, 2004, Kusnierz was driving a box truck in the right eastbound lane of Interstate 40, where the truck struck and killed Philip James Darling. Darling, lived in Cookeville, Tennessee, but worked for Chem-Lawn in Nashville. (Docket Entry No. 36-4, Exhibit C, Deposition of Renita Darling, at 34). His commute to work was approximately one hour and fifteen minutes each way. Darling would leave home on Sunday evening and remain in Nashville until either late

---

[3] Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-252 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 371 (1986). The Court concludes that there are material factual disputes. Thus, this section does not constitute findings of fact under Fed.R.Civ.P. 56(d).

Wednesday evening or early Thursday morning. (Id. at 53, 63). Darling would work forty to forty-five hours in three days, sometimes as many as eighteen hours in one day, sleeping at night in a camper that he maintained at the Chem-Lawn site. (Id. at 52-53, 62). Around suppertime or later on Wednesday, February 11, 2004, Darling telephoned his wife to inform her of his return home. Darling told his wife that he still had work yet to complete, and that he would not be able to leave until the next morning. Darling's intention was to sleep in the camper. (Id. at 62-63).

At some point the next morning, Darling left Nashville for his home. Whether, or for how long, Darling slept cannot be ascertained. At about Exit 273, in Putnam County, Tennessee, Darling decided to pull his van into the emergency lane along the right side of the highway.

Apparently Darling was attending to a flat tire, but it is unclear what the actual problem was. Photographs of the accident scene show that the van was completely pulled off of the highway, far enough away that a tire was lying flat between the van and the right lane, with some inches to spare. (Defendant's Exhibit 5, attached to Docket Entry No. 36-3, Exhibit B, Deposition of Melvin Strickland). The van had a lighted amber beacon on its roof and Darling placed two orange cones behind the van, an orange flag on the rear driver's side, and an orange caution sign in the rear window. Darling had activated the van's emergency flashers. (Docket Entry No. 53, Kusnierz's Response to Plaintiff's Statement of Material Facts, at ¶ 2). ).

Kusnierz, was driving a box truck, owned by JBE and leased to C & M, eastbound on Interstate 40. (Id. at ¶ 48; Docket Entry No. 26, Answer of Kusnierz, at ¶ 10; Docket Entry No. 23, Answer of JBE, at ¶ 10; Docket Entry No. 22, Answer of C &

M, at ¶ 10). On February 11, 2004, the day before the accident, Kusnierz began his trip in Mesquite, Texas, and stated that he drives 700 miles for eight hours and forty-five minutes to Nashville. (Docket Entry No. 36-2, Deposition of Kazimierz, Kusnierz, at 66). Kusnierz's log reflects that he stopped and slept for six and one-half hours the night of February 11, 2005, beginning at 12:55 am. Kusnierz later admitted that he kept a false driver log—a receipt places him in a Nashville Wal-Mart, making a purchase at 12:55 am. (Docket Entry No. 39-2, Plaintiff's Brief in Response to Kusnierz Motion for Summary Judgment, at 20). After the accident, Kusnierz was cited for maintaining a false log book in violation of 49 C.F.R. §395.8(e). (Docket Entry No. 1, Joint Petition for Removal, Exhibit A).

According to Kusnierz, he first saw the van several hundred yards away with a amber light on top of the van, the emergency flashers, and the orange cones behind the van. (Docket Entry No. 36-2, Deposition of Kazimierz Kusnierz, at 145-47). Kusnierz later testified that he saw the flag and the sign at a distance of more than one hundred yards. (Docket Entry No. 39-2, Plaintiff's Brief in Response to Kusnierz Motion for Summary Judgment, at 10). Kusnierz testified that Darling was holding some kind of wire or rope in his hands. (Docket Entry No. 36-2, Deposition of Kazimierz Kusnierz, at 152).

Kusnierz testified that he would have been able to bring his truck to a complete stop in the time between noticing the van and pulling alongside it. (Docket Entry No. 36-2, Deposition of Kazimierz Kusnierz, at 147). Kusnierz testified that he was unable to change lanes and did not use his turn signal to indicate a desire to move into the left lane. (Id. at 149-50). Kusnierz was driving between 50-55 mph (in a 70 mph zone) at the time

23

he approached the decedent's van. (Docket Entry No. 36-2, Deposition of Kazimierz Kusnierz, at 150).

According to Kusnierz, Darling was not visible until he pulled alongside the disabled van. (Docket Entry No. 36-2, Deposition of Kazimierz Kusnierz, at 149). Kusnierz described Darling as appearing to stumble and fall forward into traffic, landing on his side. (Id. at 152). An eyewitness testified that he noticed nothing unusual about the way Kusnierz was driving. (Docket Entry No. 36-3, Deposition of Melvin Strickland, at 25). The eyewitness also testified that Darling was backpedaling, and fell backward underneath the box truck. (Docket Entry No. 36-3, Deposition of Melvin Strickland, at 18). Both men state that this all happened in an instant. The only part of the box truck that struck the decedent was the right rear wheels. (Id. at 15). Apparently, "[t]he timing was perfect." (Id. at 18).

The only identified eyewitness to the accident confirmed that the van was visible and that the amber light was noticeable from several hundred yards. (Docket Entry No. 53, Kusnierz's Response to Plaintiff's Statement of Material Facts, at ¶ 5). It is unclear how far the eyewitness was from Kusnierz's truck at the time of the accident, but he was far enough away, that after seeing the accident, he was able to bring his own truck to a complete stop some thirty to forty yards away from the scene. (Docket Entry No. 39-2, Plaintiff's Memorandum in Response to Kusnierz Motion for Summary Judgment, at 35).

There is some disagreement as to the position of the box truck at the time of the accident. Kusnierz testified that, upon seeing Darling about to fall, he swerved to the left, so that his truck was close to the center line at the moment of impact. (Docket Entry No. 36-2, Deposition of Kazimierz Kusnierz, at 151-52). Yet, Kusnierz stated that he

24

was still in the right lane. Id. The eyewitness described the truck as pulled half way into the left lane, straddling the center line. (Docket Entry No. 36-3, Deposition of Melvin Strickland, at 16-17).

The record does not clearly define the nature of the relationship between the three defendants. First, it is unclear who hired Kusnierz to drive the box truck on this particular trip. The Contract Hauling Agreement executed by JBE (the lessor) and C & M (the lessee) reflects that JBE would hire a driver for the truck. (Docket Entry No. 74-3, Exhibit B, Contract Hauling Agreement, at 3, 6). Mr. Bardecki, JBE's owner and president, stated in his affidavit that JBE did not hire Kusnierz, but he stated in his deposition that he played a role in bringing Kusnierz and C & M together. (Docket Entry No. 55-2, Affidavit of Zygmunt Mark Bardecki, at 2-3; Docket Entry No. 56-1, Exhibit C, Deposition of Zygmund [sic] Mark Bardecki, at 26).

During the discovery process, the Defendants disagreed as to who actually employed Kusnierz. The co-owner of C & M testified that Kusnierz was not "employed by" C & M; the Safety Director at C & M testified that Kusnierz worked for JBE; finally, Kusnierz himself testified in his deposition that he was employed by JBE. (Docket Entry No. 74-1, Plaintiff's Response to JBE's Second Motion for Summary Judgment, at 18-19). While JBE claims Kusnierz was testifying as to his "current" employment (his deposition being taken over one year after the accident), the testimony of C & M's co-owner suggested that the "worked with," but not "employed by" C & M, a situation that had lasted for five years. (Id. at 19).

At the time of the accident, the box truck displayed a C & M placard, and the Contract Hauling Agreement, pursuant to 49 C.F.R. § 376.12(c), stated that C & M

25

assumed "exclusive possession, control, and use of" the box truck. (Docket Entry No. 56-1, Memorandum in Support of JBE Second Motion for Summary Judgment, at 2; Docket Entry No. 74-3, Exhibit B, Contract Hauling Agreement, at 2). Yet, the Contract Hauling Agreement reserved for JBE the right to "hire, direct, pay, control and discharge" drivers. (Docket Entry No. 74-3, Exhibit B, Contract Hauling Agreement, at 3). It is worth noting that the actual lease agreement that JBE and C & M executed for the box truck itself has not been located.

In summary of the earlier discussion of their affidavits, Plaintiff's experts opine that Darling could not have fallen the distance suggested by the Defendants in the time necessary to have only been struck by the rear right wheels of the box truck. If the box truck were straddling the center line at the time of the accident, Plaintiff's expert opines Darling would have to have moved at "approximately 3-4 times the typical speed of a jogging 50 year old male" to have fallen precisely between the axles at the instant the box truck passed his disabled van. (Docket Entry No. 39-6, Stopper Affidavit, Preliminary Report, at 4). The expert calculated that given the distance between the axles on the box truck, and assuming Kusnierz's testified to speed of 50-55 mph, "Mr. Darling would have to trip and fall perpendicular from the shoulder of the road to a position approximately 5-6 feet into the travel lane in 0.19 seconds or less." (Id. at 13-14). Plaintiff's expert concluded "[a] light sideswipe of Mr. Darling would project him forward and under the rear tires rather than a non contact run over with the rear tires only as perceived by [the eyewitness] from a significant distance away." (Id. at 14).

Second, Plaintiff's experts opine that Kusnierz was likely fatigued at the time of the accident. This conclusion is based upon a reconstruction of Kusnierz's trip from

26

Mesquite, Texas to Nashville, a 718 mile trip that Kusnierz could not have completed in the hours recorded on his falsified driver log. (Id. at 15). Plaintiff's expert is a specialist in "sleep physiology." (Docket Entry No. 39-8, Affidavit of Merrill M. Mitler, Ph.D.).

Wylie, Plaintiff's expert and author of the "Driving Safety" section of the Commercial Driver License Manual, opined that the accident would have been preventable if Kusnierz had fulfilled the customary standard of care that the CDL Manual establishes. Such violations include failure to keep a proper lookout, failure to notify Darling of his presence by sounding his horn, failure to manage properly the space surrounding his truck, and failure to respond appropriately to a foreseen hazard. (Docket Entry No. 39-9, Affidavit of Dennis Wylie, Expert Report, at 7-8). The CDL manual contains a warning that "[d]rivers changing a tire or fixing an engine often do not pay attention to the danger that roadway traffic is to them"—accordingly, the manual expects that drivers "look for hazards in order to have time to plan a way out of any emergency." (Id. at 6 (emphasis removed)). Plaintiff's experts assert that Kusnierz's employer(s) failed to adequately train him to manage fatigue and emergency situations.

## II. Conclusions of Law

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Fed. R. Civ. P. (2006). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that she had to come forward with all of her evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

27

In <u>Anderson v. Liberty Lobby, Inc.</u>, the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.
>
> <u>As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment</u>.  Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. 242, 247-48 (1986) (emphasis in the original and added in part).  Earlier the Supreme Court defined the absence of a genuine issue of material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  <u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986).  Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. <u>Emmons v. McLaughlin</u>, 874 F.2d 351, 355-57 (6th Cir. 1989).  <u>But see</u> <u>Routman</u>, 873 F.2d at 971.

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in <u>Celotex</u>

Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239n.4 (6th Cir.). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991) (quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrating the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons, 874 F.2d at 353 (6th Cir. 1989) (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and] . . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting Liberty Lobby). Moreover, the Court of Appeals explained that

The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

Street, 886 F.2d at 1480 (citations omitted). See also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" (quoting Liberty Lobby)).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

> * * *

> Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted and emphasis added). It is likewise true that

> [I]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It

> has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute * * * .'

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Company, 791 F.2d 43, 46 (6th Cir. 1986) app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion) (citation omitted).

The Court of Appeals further explained the District Court's role in evaluating the proof on a summary judgment motion.

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establish a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nomoving party to 'designate' facts by citing specific page numbers. Designate means simply 'to point out the location of.' Webster's Third New International Dictionary (1986).

> Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied 100 S.Ct. 1839 (1990). Here, the parties have given some references to the proof upon which they rely. Local Rule 56.01 requires a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment, and synthesized ten rules in the "new era" on summary judgment motions.

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing 'the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6. As on federal directed verdict motions, the 'scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the 'old era' in evaluating the respondent's evidence. The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all of the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

As for applicable law, in this diversity action, state law controls on the parties' substantive claims and defenses. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817 (1938). All parties agree that Tennessee law applies to the parties' claims and defenses. The plaintiff is a Tennessee resident; her decedent was also a Tennessee resident. Defendant Kusnierz was in Tennessee, where the injury occurred, as an agent of C & M and, allegedly, as an agent of JBE. See Hataway v. McKinley, 830 S.W.2d 53, 59 (Tenn. 1992) (adopting the "most significant relationship" test for choice of law issues involving tort claims). The parties argue Tennessee law and the Court applies Tennessee law.

The threshold issue is the sufficiency of the evidence and whether the jury could find negligence by the Defendants. Under Tennessee law, Plaintiff must establish five elements to prevail on her negligence claim: "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct falling below the applicable standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal, cause." McClenahan v. Cooley, 806 S.W.2d 767, 774 (Tenn. 1991); accord, McClung v. Delta Square Limited Partnership, 937 S.W.2d 891, 894 (Tenn. 1996).

33

Negligence is neither presumed nor inferred from the mere occurrence of an accident or injury. Hickman v. Jordan, 87 S.W.3d 496, 499 (Tenn. Ct. App. 2001); Armes v. Hulett, 843 S.W.2d 427, 432 (Tenn. Ct. App. 1992); Williams v. Jordan, 346 S.W.2d 583, 586 (Tenn. 1961). Where the evidence of the parties conflicts, or where that evidence reasonably leads to different conclusions, negligence issues, specifically questions of ordinary care and proximate cause, are questions for a jury. Hickman, 87 S.W.3d at 49. See also, Anderson v. City of Chattanooga, 978 S.W.2d 105, 107 (stating that while duty is a question of law in Tennessee, breach and causation are questions of fact). Accordingly, the Tennessee Supreme Court has noted, "[a]s a general rule summary judgments are not appropriate in negligence cases." Bowman v. Henard, 547 S.W.2d 527, 530 (Tenn.1997).

Negligence "more frequently appear[s] to turn on issues of conflicting circumstantial evidence with conflicting versions of the historical facts of the case." 11 Moore's Federal Practice, § 56.31[2] (Matthew Bender 3d ed.). Indeed, Tennessee law provides that "[s]ummary judgment *is appropriate* when an essential element of negligence is missing" from the plaintiff's case in chief. Kellner v. Budget Car & Truck Rental, Inc., 359 F.3d 399, 406 (6th Cir. 2004) (emphasis added). See Doe v. Linder Constr. Co., Inc., 845 S.W.2d 173, 183 (Tenn. 1992) ("For a negligence case to go before a jury, the plaintiff has the burden to establish the necessary elements of negligence.").

Defendant Kusnierz's motion for summary judgment raises the issues of breach of duty and proximate cause.

## 1. Breach of Duty

34

Under Tennessee law, all persons have a duty to exercise reasonable care by "refrain[ing] from conduct that will foreseeably cause injury to another." Bradshaw v. Daniel, 854 S.W.2d 865 (Tenn. 1993). See also Pittman v. Upjohn Co., 890 S.W.2d 425, 428 (Tenn. 1994). Failure to exercise reasonable care, under the circumstances, constitutes a breach of this duty. Kellner, 359 F.3d at 404; Linder Constr, 845 S.W. 2d at 178. Some minimum duties are established by statute, such that the "failure to perform a statutory duty is negligence per se." Tennessee Trailways, Inc. v. Ervin, 438 S.W.2d 733, 735 (Tenn. 1969). See Hickman v. Jordan, 87 S.W.3d 496, 499 (Tenn. Ct. App. 2001) (noting that "statutory requirements help to determine the minimum standard of care").

Tennessee statutory law provides that "every driver of a vehicle shall exercise due care to avoid colliding with any pedestrian upon any roadway." Tenn. Code Ann. § 55-8-136 (2006). Commercial carriers are also subject to the Federal Motor Carriers Safety Regulations (FMCSR), 49 C.F.R. § 390 et. seq. See also Tenn. Code. Ann. § 65-15-101 et. seq. (2006). Where a driver is found to have violated a statute, ordinance, or regulation intended to protect a class of persons that includes the victim, this is often taken to be evidence of a defendant's per se negligence. "Generally, a claim of negligence per se may be supported only by statutes and regulations relating to public safety, such as health regulations and rules of the road." Scarborough v. Brown Group, Inc., 935 F.Supp. 954, 964-65 (W.D. Tenn. 1995). The FMCSR certainly relates to issues of public safety. The requirement to maintain a proper log book is directly related to the effort to enforce hours-of-service regulations. Accordingly, the Court concludes

that Kusnierz's citation for maintaining a false log book—a violation of 49 C.F.R. § 395.8(e)—constitutes negligence per se.

The Plaintiff alleges that Kusnierz violated other provisions of Tennessee statute and the FMCSR—reckless driving, Tenn. Code Ann. § 55-10-205; hours-of-service violation, 49 C.F.R. § 395.3; fatigued driver, 49 C.F.R. § 392.3; schedules that do not conform to speed limits, 49 C.F.R. § 392.6. (Docket Entry No. 1, Joint Notice of Removal, Complaint). Absent a conviction for violation, whether a party's actions constitute a violation of a statute is a jury question. See Womble v. Walker, 390 S.W.2d 208, 212 (Tenn. 1965) (holding that whether a defendant's actions constitute a violation of the reckless driving statute is a jury question); Thomas v. Harper, 385 S.W.2d 130, 138 (Tenn. Ct. App. 1964) (same); Arnett v. Fuston, 378 S.W.2d 425, 428 (Tenn. Ct. App. 1963) (same). Based on the affidavits of Plaintiff's experts, there is a sufficient issue of genuine material facts as to the allegations that Kusnierz violated these other provisions.

The Plaintiff also alleges breach of duty under common law principles of negligence. Tennessee common law provides that drivers are "under a duty to keep a reasonably careful lookout commensurate with the dangerous character of the vehicle and the nature of the locality." Hale v. Rayburn, 264 S.W.2d 230, 233 (Tenn. Ct. App. 1953). Certain conditions "may require a driver to use an even greater degree of care." Hickman, 87 S.W.3d at 499. Consequently, "the standard for such reasonable care is flexible, some occasions and sets of circumstances requiring a higher degree of care than others." Strickland Transp. Co. v. Douglas, 264 S.W.2d 233, 237 (Tenn. Ct. App. 1953). See McClenahan, 806 S.W.2d at 774 ("Considering special circumstances, then, is just

36

another way of examining the degree of foreseeability of injury . . . ."). Juries must decide issues of fault where reasonable minds could differ as to a party's failure to exercise the appropriate standard of care under the circumstances. Hickman, 87 S.W.3d at 500; Strickland Transp. Co., 264 S.W.2d at 237.

As to Darling, "[a] pedestrian has a duty 'to exercise ordinary care for his own safety, to be measured by the situation confronting him; such care as the immediate circumstances of place and condition demand of an ordinarily prudent person . . . .'" Blalock v. Claiborne, 775 S.W.2d 363, 365 (Tenn.Ct.App. 1989) (quoting Zamora v. Shappley, 173 S.W.2d 721, 723 (Tenn.Ct.App. 1941)). But even if a victim was in some manner negligent, thereby creating or enhancing a risk of injury, "if the defendant after discovering [the victim's] peril, or by the exercise of ordinary care should have avoided the consequence of such negligence by the exercise of ordinary care and failed to do so, the defendant is liable." Harbor v. Wallace, 211 S.W.2d 172, 175 (Tenn. Ct. App. 1946).

Kusnierz contends, however, that he did not breach any duty owed to Plaintiff's decedent—that he "was not required to anticipate such an unusual or remotely possible event" as "that a pedestrian would suddenly emerge from the front of the vehicle, falling into the path of oncoming traffic." (Docket Entry No. 36-1, p.12). Yet,

> Tennessee * * * has long recognized the doctrine of sudden emergency. Under the doctrine, one confronted with a sudden emergency is not held to the same accuracy of judgment as would be required if he had time for deliberation; and if he exercises such care as an ordinarily prudent person would exercise in a like emergency, he is not liable for the resulting injury. The arising of an emergency does not, however, relieve one from the obligation of exercising ordinary care under the circumstances.

Irvin v. City of Kingsport, 602 S.W.2d 495, 498 (Tenn. Ct. App. 1980) (citing McClard v. Reed, 190 Tenn. 337, 229 S.W.2d 505 (Tenn. 1950) and Moody v. Gulf Refining Co.,

37

142 Tenn 280, 218 S.W. 817 (Tenn. 1920)). Under Tennessee law, whether a driver faced a sudden emergency is a question of historical fact appropriate for a jury, which must also consider the defendant's role in creating the emergency situation. Ellison v. Lankford, 650 S.W.2d 762 (Tenn. Ct. App. 1983).

While carriers are not uniformly held to a higher standard of care than automobile operators, the question of breach is fact specific. Independent of his violation of the FMCSR, the evidence here, viewed in the light most favorable to the Plaintiff, reflects that a reasonable jury could conclude that Kusnierz breached the duty of care he owed to Darling. From the evidence, the decedent availed himself of several precautionary steps to make his disabled vehicle apparent to approaching motorists —he placed orange cones behind his van, there was an amber beacon on the roof, he employed a warning sign and flag—intended to notify oncoming traffic of his presence. (Docket Entry Nos. 53, 64). Such facts are generally intended to warn approaching motorists of potential hazards and are employed for purposes of self-protection.[4]

According to the proof, Kusnierz first saw the van a few hundred yards away, and that the van was marked as described above. (Docket Entry Nos. 36-2, 44, 53, 64). An eyewitness, who was driving in the vicinity of Kusnierz testified that not only was the van visible, the van was the first thing he noticed was the amber light atop the vehicle. (Docket Entry Nos. 36-3, 44, 53, 64). Although Kusnierz contends that automobiles were ahead of, behind, and beside his truck, there is no evidence that he made any effort

---

[4] This is not to say, however, that as a matter of law the plaintiff's decedent did not negligently contribute to the accident. Such a consideration is appropriate for a jury, as would be any apportionment of the fault among the parties to this claim resulting from jury conclusions on the question of legal causation (see below). It is worth noting, however, that Tennessee statute sets the standard of care to be exercised by operators of parked, disabled vehicles. See Tenn. Code Ann. §§ 55-8-158, 55-9-103 (2006). See also, Kellner v. Budget Car & Truck Rental, Inc., 359 F.3d 399, 404 (6th Cir. 2004) holding that a motorist who gave sufficient warning "did not breach any duty of care" owed to a motorist who collided with his parked, disabled vehicle.

Case 2:05-cv-00017   Document 86   Filed 08/03/06   Page 38 of 51 PageID #: 1224

to change lanes (e.g., using his turn signal) when he saw the van and its warning lights several hundred yards ahead. Plaintiff's experts testimony is that Kusnierz neglected to follow customary practices concerning recognition and avoidance of potential hazards and that Kusnierz likely was fatigued.

The Court concludes that a reasonable jury could find entirely independent of the missing log or other alleged violations of Tennessee statutes or the FMCSR, that Kusnierz should have been aware of the potential presence of an individual tending to his vehicle, regardless of whether he actually saw the decedent as he approached the van, and that Kusnierz breached this duty by failing to exercise an appropriate standard of care under the circumstances.

The Defendants' motions for summary judgment next suggest that Darling fell under Kusnierz's box truck and thereby caused his own death. Kusnierz contends, assuming that he was negligent, his actions were not a legal cause of Darling's death.

"In Tennessee, proximate cause has been described as that act or omission which immediately causes or fails to prevent the injury; an act or omission occurring or concurring with another which, if it had not happened, the injury would not have been inflicted." Ervin, 438 S.W.2d at 735. See Deming v. Merchants' Cotton-Press & Storage Co., 17 S.W. 89, 99 (Tenn. 1891). Proximate cause is perhaps the thorniest issue for this tort. See McClenehan, 806 S.W.2d at 774; Lancaster v. Montesi, 390 S.W.2d 217, 220 (Tenn. 1965).

Under the law of negligence, in addition to being an actual cause (a cause-in-fact) of the plaintiff's injury, a defendant's actions or omissions must also be a proximate, or legal cause of the injury, if the Defendant's actions are to constitute fault. See Prosser

39

and Keeton on Torts, 5th ed., § 42 (West 1984); Restatement (Second) of Torts, § 430 (1965). Part of the difficulty in addressing questions of proximate cause stems from the fact that many of the elements of negligence are not conceptually exclusive. For example, the question of a breach of duty hinges on the foreseeability of a particular risk (or of an intervening event); foreseeability also weighs heavily on the question of proximate cause.

The Tennessee Supreme Court articulated "a three-pronged test for proximate causation": (1) the conduct of the tortfeasor must have been a substantial factor in bringing about the injury; (2) there can be no legal rule or policy that relieves the tortfeasor from liability for the injury; and (3) the injury must "have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence." McClenehan, 806 S.W.2d at 775. See also Lowery v. Franks, No. 02A01-9612-CV-00304, 1997 Tenn. App. LEXIS 617, *11-12 (Tenn.Ct.App. Sept. 10, 1997); Restatement (Second) of Torts, § 431 (1965) (suggesting the substantial factor test and absence of exculpatory rule of law). The Tennessee Supreme Court continued:

> The foreseeability requirement is not so strict as to require the tortfeasor to foresee the exact manner in which the injury takes place, provided it is determined that the tortfeasor could foresee, or through the exercise of reasonable diligence should have foreseen, the general manner in which the injury or loss occurred. * * * 'The fact that an accident may be freakish does not per se make it unpredictable or unforeseen.' City of Elizabethtown v. Sluder, 534 S.W.2d 115, 117 (Tenn. 1976). It is sufficient that harm in the abstract could reasonably be foreseen. * * * Finally, proximate causation is a jury question unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons agree on the proper outcome.

McClenehan, 806 S.W.2d at 775. See Ervin, 438 S.W.2d at 736 ("Ordinarily, the question of proximate cause falls within the province of the jury."); Prosser and Keeton

40

on Torts, 5th ed., § 45 ("[I]t may properly be said that 'proximate cause is ordinarily a question of fact for the jury, to be solved by the exercise of good common sense in the consideration of the evidence in each particular case.'" (quoting Healy v. Hoy, 132 N.W. 208 (Minn. 1911))).

A defendant's breach of duty may not necessarily be a proximate cause of a complainant's injury. Although violation of a statute may constitute per se negligence, "this rule in no way dilutes the requirement that for the plaintiff to recover in a negligence action, the defendant's per se negligent act must be shown to have been a proximate cause of the injury." Ervin, 438 S.W.2d at 735. See Biggert v. Memphis Power & Light Co., 80 S.W.2d 90 (Tenn. 1935). Intervening or superseding causes may arise to break the causal link between a defendant's act or omission and the injury suffered by the complainant. Whereas Tennessee's "test for liability under the law of intervening cause requires a person to anticipate or foresee what would normally happen[,] one is not required to anticipate and provide against what is unusual or unlikely to happen." Underwood v. Waterslides of Mid-America, Inc., 823 S.W.2d 171, 180 (Tenn. Ct. App. 1991) (citing Ward v. Univ. of the South, 354 S.W.2d 246 (Tenn. 1962)). Nevertheless, "[a]n intervening act will not exculpate the original wrongdoer unless it appears that the negligent intervening act could not have been reasonably anticipated." Everidge v. American Honda Motor Co., 685 S.W.2d 632, 635 (Tenn. 1985).

Such intervening actions may include the negligence of the victim, as the Defendants argue here. Tennessee's system of modified comparative fault provides that a defendant may not be found liable for a plaintiff's injury if that defendant's negligence was not a sufficient legal cause of the harm. The forty-nine percent (49%) rule adopted

by the Tennessee Supreme Court provides that "so long as a plaintiff's negligence remains less than the defendant's negligence the plaintiff may recover," with damages "to be reduced in proportion to the percentage of the total negligence attributable to the plaintiff." McIntyre v. Balentine, 833 S.W.2d 52, 57 (Tenn. 1992).

The important inquiry under this comparative fault regime is, "assuming that both plaintiff and defendant have been found guilty of negligent conduct that proximately caused the injuries, was the fault attributable to plaintiff equal to or greater than the fault attributable to the defendant[?]" Eaton v. McLain, 891 S.W.2d 587, 590 (Tenn. 1994) (emphasis in original). Among other factors, the relative fault of the parties may be determined by considering (1) "the reasonableness of the party's conduct in confronting a risk, such as whether the party knew of the risk, or should have known of it;" (2) "the existence of a sudden emergency requiring a hasty decision;" and (3) "the party's particular capacities, such as age, maturity, training, education, and so forth." Id. at 592.

Here, the Defendants cite a number of decisions in which defendant drivers were found, as a matter of law, not to have been the proximate cause of a plaintiff's injuries, even in instances where the defendant was negligent. See Whaley v. Wolfenbarger, No. 03A01-9904-CV-00129, 2000 Tenn.App. LEXIS 54 (Tenn.Ct.App. Jan. 28, 2000); Perry v. Dewey, no. 02A01-9406-CV-00142, 1995 Tenn.App. LEXIS 475 (Tenn.Ct.App. July 18, 1995).

Each of these decisions draws upon Tennessee Trailways, Inc. v. Ervin, in which a plaintiff's decedent, when approaching an intersection, unexpectedly pulled his motorcycle into the path of a bus that may have been exceeding the speed limit. The Tennessee Supreme Court upheld a directed verdict for the defendant, noting that "the

42

only conclusion that can be reasonably arrived at is that whatever unlawful degree of speed defendant could be found guilty of could have no legal bearing on the cause of this tragic accident." Ervin, 438 S.W.2d at 736. A recent Tennessee Court of Appeals decision, Lowery v. Franks, that relies heavily on Ervin, affirmed a grant of summary judgment to a defendant who struck and killed a pedestrian.[5] In Lowery, plaintiff's decedent was walking along an unlighted section of a two-lane highway, after dark, and whilst clothed in dark colors. In both cases, the unforeseeable approach of the decedent was central to the conclusion that the defendant bore no fault for the accident. Ervin, 438 S.W.2d at 735; Lowery, 1997 Tenn.App. LEXIS 617, at *22.

Similarly, Defendant C & M points to McCain v. Pugh, No.W2000-02218-COA-R3-CV, 2002 WL 818227 (Tenn.Ct.App. April 29, 2002), in which the plaintiff, a resident of a nursing home, unexpectedly stepped into the road and was injured when struck by an automobile. The defendant driver testified that he saw the plaintiff alongside the road and knew that he was approaching a nursing home. Id. at *2. He also testified that he made no extraordinary attempt to avoid the plaintiff, because "at no time did McCain indicate that he was about to suddenly step into the roadway." Id. at *3. The Tennessee Court of Appeals upheld a directed verdict for the defendant, holding that no reasonable jury could have found that the injuries were caused by the defendant's negligence. Id. at *4.

The Defendants argue that these decisions (and others) demonstrate that summary judgment is appropriate on the claims before this Court. Of course, summary judgment requires a case specific analysis, inasmuch as the decision is based upon the evidence

---

[5] Defendant C & M, quite unhelpfully, devoted over one-third (1/3) of its brief supporting the motion for summary judgment to directly quoting the decision in Lowery v. Franks.

peculiar to each case. Here, Ervin, McCain, and Lowery are persuasive only if: (1) the Plaintiff's decedent did indeed fall unexpectedly into the path of Kusnierz's truck and (2) that no alleged negligence by any of the defendants was a proximate cause of the accident. This analysis ultimately rests on determining whether the Defendants' account of the accident is sufficiently disputed by the Plaintiff's contention that Mr. Darling was actually pulled into traffic by the box truck, due to Kusnierz's negligence. This might properly be deemed "an historical fact"—"a matter about which the factfinder is called on to determine the unfolding of an event or the existence or nonexistence of a matter. This type of fact finding generally must be done at trial, not through summary judgment." 11 Moore's Federal Practice § 56.11[b] (Matthew Bender 3d. ed.). See also Dobbs, The Law of Torts, § 148 (West 2001) ("Where evidence shows a dispute about historical facts, the jury is almost always invariably the decision-maker.").

On proximate cause, the Court concludes that Plaintiff has sufficient proof to dispute the Defendants' characterization of the facts that led to Darling's death. Plaintiff's collective expert testimony presents an account of the accident that a reasonable jury could find persuasive. Most significant for jury consideration is Stopper's analysis, which questions the likelihood that Darling would have been able to fall into the path of the box truck in such a fashion as to only have been struck by the rear right wheels.

Also noteworthy are important factual distinctions between Ervin, McCain, and Lowery, and the record before this court. Specifically, the incidents in Ervin, et. al. all took place on two lane highways, and the decedents in those cases took no extraordinary steps to make themselves visible to oncoming traffic. For example, in Lowery, the

44

decedent was wearing dark clothing and walking after dark—facts important to that court in judging the unforeseeable nature of the accident in question. Here, Darling's use of warning implements is an important factor for a jury's consideration of the foreseeable and avoidable nature of the accident in question. Despite Defendant C & M's claim to the contrary, the Plaintiff has sufficiently distinguished this precedent on the facts here. (See Docket Entry No. 46-1, at pp.6-9).

For its motion, JBE is correct that the Interstate Common Carrier Act creates "an irrebuttable statutory employment relationship between [a] driver and the carrier-lessee." Holliday v. Epperson, No. 1:02-CV-1030-T, 2003 WL 2340746, at * 3 (W.D. Tenn. Aug. 26, 2003). See Gilstorff v. Top Line Express, Inc., No. 96-3081, 1997 WL 14378, at *2n.6 (6th Cir. Jan. 14, 1997) (suggesting that the Sixth Circuit adopts this interpretation of ICC regulations); Wyckoff Trucking, Inc. v. Marsh Brothers Trucking Service, 569 N.E.2d 1049, 1053 (Ohio 1991) (adopting the "doctrine of statutory employment" and holding that "if the driver is negligent, the carrier-lessee is liable as a matter of law for accidents that occur while a lease is still in effect . . . ."). See also Baker v. Roberts Express, Inc., 800 F.Supp. 1571, 1574 (S.D. Ohio 1992) (adopting the Ohio Supreme Court's interpretation of ICC regulations in Wyckoff Trucking). Thus, as a matter of law, Kusnierz was a statutory employee of C & M at the time of the accident that killed Darling.[6]

Yet, this doctrine does not mean that only the statutory employer—i.e., only the carrier-lessee—can be held liable in negligence for the actions of a driver. Although there is not any Tennessee law on point, the Court notes the concurring opinion in Wyckoff

---

[6] The Ohio Court of Appeals for the Sixth Circuit has suggested that this doctrine might need to be revisited in light of a 1992 amendment to Title 49, C.F.R. See Bookwalter v. Prescott, No. L-05-1015, 2006 WL 307699, at *3 (Ohio Ct. App. Feb. 10, 2006).

Trucking explaining that the doctrine of statutory employment "does not eliminate the common-law liability of parties other than the statutory employer." 569 N.E.2d at 1054 (noting that this position has been adopted by the Fifth and Eighth Circuits). While Interstate Commerce Commission ("ICC") regulations were intended to remedy "public confusion as to who [is] financially responsible for accidents caused by [leased or interchanged] vehicles," and "to insure that motor carriers would be fully responsible for the operation of vehicles certified to them," there is no reason to believe that they set exclusive parameters of liability. Wyckoff Trucking, 569 N.E.2d at 1053.

The Court concludes JBE could be held vicariously liable for Kusnierz's negligence if he were an agent of JBE under Tennessee law.

> The Tennessee cases have defined 'agency' in is broadest sense to include 'every relation in which one person acts for or represents another.' * * * The cases largely determine that an employee status is determined by whether the alleged employer has the right of control over the method as distinguished from the results and to look to such things as the right to hire and fire, to direct the manner and method of the work, as to who paid the wages, whether the pay was based upon time or by the job, whether the work was ordinary labor or skilled labor, and who provided the tools for the work.

Doane Agr'l Service, Inc. v. Coleman, 254 F.2d 40, 43 (6th Cir. 1958); cert. denied 358 U.S. 818 (1958).

In its motion for summary judgment, JBE cites Armoneit v. Elliott Crane Service, Inc. for its contention that "the actual control of means and methods" is a "key element in the creation of a master servant relationship." 65 S.W.3d 623, 629 (Tenn.Ct.App. 2001). Under Tennessee law, the right to control is sufficient to establish an employer-employee relationship in Tennessee—"The 'right to control is the primary or essential test of an agency relationship without which no agency exists.'" Sodexho Mgt., Inc. v. Johnson,

174 S.W.3d 174, 178 (Tenn.Ct.App. 2004) (quoting Nidiffer v. Clinchfield RR Co., 600 S.W.2d 242, 245 (Tenn.Ct.App. 1980)). See also Stratton v. United Inter-Mountain Telephone, 695 S.W.2d 947, 950 (Tenn. 1985) (noting the importance of "the right to control the conduct of the work"); Owens v. Turner, 362 S.W.2d 793, 794 (Tenn. 1962) ("[T]he test is not whether the right was exercised, but whether it existed."); Restatement (Second) of Agency, § 220(1) (1958) (emphasizing the right to control). Tennessee courts also look to the right to terminate. See Odom v. Sanford & Treadway, 299 S.W. 1045, 1047 (Tenn. 1927); Knight v. Hawkins, 173 S.W.2d 163, 166 (Tenn.Ct.App. 1941).

Accordingly, the Tennessee Supreme Court has held that "[n]o one fact is deemed to be determinative, but the right to control and the right to terminate are usually deemed to be strong evidence of an employer-employee relationship." Starflight, Inc. v. Thoni, 773 S.W.2d 908, 910 (Tenn. 1989). See also Carver v. Sparta Electric System, 690 S.W.2d 218, 220-221 (Tenn. 1985). "[D]etermination of the existence of an employer-employee relationship as a matter of fact depends upon proof of the existence of the necessary indicia of [the employment] relationship." McGee v. County of Wilson, 574 S.W.2d 744, 746 (Tenn.Ct.App. 1978) (emphasis in original).

Whether JBE is entitled to summary judgment on the Plaintiff's claim of vicarious liability depends, therefore, on the Plaintiff's establishment of a genuine issue as to whether Kusnierz actually was an agent of JBE. Tennessee law has identified two bases for the doctrine of respondent superior: (1) "a principal is responsible for the tortious acts of his agent if he has a right to control the agent", and (2) "the principal does for himself what he does through another." Doane Agr'l Services, 254 F.2d at 43.

Here, the Court finds a material factual dispute as to which of these Defendants actually employed Kusnierz. (Docket Entry No. 74-1, Plaintiff's Response to JBE Second Motion for Summary Judgment, at 18-19). Article 7 of the Contract Hauling Agreement between JBE and C& M reflects that JBE retained the right to "provide all driver [sic], helpers, and other personnel needed in order to perform the services specified," and that it retained the right to "hire, direct, pay, control, and discharge such personnel." (Docket Entry No. 74-3, Exhibit B, Contract Hauling Agreement, at 3). Article 17 provides that "[e]ither [JBE], or a relief driver, selected and employed by him and approved by [C & M] shall drive the . . . equipment in the performance of hauling services for [C & M]." (Id. at 6). At the very least, there is a genuine issue as to JBE's relationship with Kusnierz.

JBE argues that Plaintiff's response is an attempt to enforce a contract to which it was not a party. However, the Contract Hauling Agreement is actually being used as evidence of the nature of the relationship between the three Defendants in this case, and this argument is relevant inasmuch as it could be found to describe correctly which rights JBE retained over Kusnierz. See Doan Agr'l Services, 254 F.2d at 43-44 (using a contract to determine agency for purposes of respondent superior). Based upon this proof, the Court concludes that a reasonable jury could find that JBE retained the type of control over Kusnierz so as to create an employer-employee relationship. A reasonable jury could therefore find that Kusnierz was an agent of JBE at the time of the accident at issue.

In addition, the written agreement might not constitute the actual or entire relationship between JBE and C & M nor reflect the actual rights that JBE retained over

48

Kusnierz. The Contract Hauling Agreement is subject to multiple interpretations, based upon the reality of the relationship between the parties—a "jury [would be] warranted in considering its practical construction by the acts of the parties thereto." Doane Agr'l Services, 254 F.2d at 44.

For the reasons stated above, the Court concludes that JBE is not entitled to summary judgment on the question of vicarious liability for the negligence of Kusnierz. The Court further concludes that JBE is also not entitled to summary judgment on the question of negligent supervision. Negligent supervision differs from respondent superior in that it is a direct basis for an employer's liability. 30 CJS Employer, § 189 (2006). Tennessee law does not "specifically define[] the elements of negligent supervision"; the tort must therefore be proven as any other, by demonstrating (1) injury, (2) duty, (3) breach, and (4) causation (actual and proximate). Holliday, 2003 WL 23407496 at *5.

If a jury finds that Kusnierz was JBE's agent, then it follows that JBE also had a duty, as a matter of law, to supervise Kusnierz in the course of his employment, and that JBE could be found liable under a theory of negligent supervision. See Holliday ex. rel. Estate of Holliday v. Epperson, No. 02-1030-T, 2003 WL 23407498 at *3 (W.D. Tenn. July 28, 2003) (granting summary judgment on negligent supervision claim because the moving party did not employ the tortfeasor). Such a duty of reasonable care would necessarily follow from retention of the right to control the manner and method of his work. Of course, a reasonable jury could find that JBE did not breach this duty when (as it contends) it relied on C & M to undertake the actual supervision of Mr. Kusnierz. (See Docket Entry No. 56-1, Brief in Support of JBE Second Motion for Summary Judgment).

For many of the same reasons, a jury could finds Kusnierz was an agent of JBE, and the Court concludes that the jury could also find that JBE hired Kusnierz. Here, viewing the facts in the light most favorable to the non-moving party, it is unclear who exactly hired Kusnierz. Although Bardecki, JBE's owner and president has stated in an affidavit that JBE did not hire Kusnierz, the language of the Contract Hauling Agreement suggests that JBE accepted the responsibility to provide a driver for the leased box truck. (Docket Entry No. 56-1, Exhibit A, Affidavit of Zygmunt Mark Bardecki, at 2-3). Whether JBE actually did so, or whether this task was completed by C & M, is unclear. In his deposition, Bardecki states that he had "some role in bringing Kusnierz and C & M together"—exactly what this consisted of is not detailed in the record. (Docket Entry No. 56-1, Exhibit C, Deposition of Zygmund [sic] Mark Bardecki, at 26). An open question exists on whether JBE hired Kusnierz to drive the box truck that struck and killed Plaintiff's decedent. Therefore, summary judgment on the Plaintiff's claims against JBE for negligent hiring and negligent entrustment is inappropriate.

Finally, JBE seeks summary judgment on whether it and C & M were engaged in a joint enterprise. Plaintiff responds that a genuine issue exists on whether the two entities were "joint employers" of Kusnierz. Because the Plaintiff has not responded to the issue of joint enterprise, the Court concludes that JBE should be entitled to summary judgment on this theory. The Court notes, however, that this conclusion does not negate Plaintiff's underlying contention that joint and several liability exist among the Defendants. If a jury finds that Kusnierz was an agent of JBE, then C & M and JBE would be jointly and severally liable to the Plaintiff for Kusnierz's negligence.

In sum, the Court concludes that JBE is not subject to the FMCSR; that C & M was the statutory employer of Kusnierz; and that JBE should be awarded summary judgment on Plaintiff's claim that JBE and C & M were not engaged in a "joint enterprise." The Defendants' motions for summary judgment should otherwise be denied.

An appropriate Order is filed herewith.

ENTERED this the ___1___ day of July, 2006.

WILLIAM J. HAYNES, JR.
United States District Court